UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JANE A. TAYLOR,

                          Plaintiff,                      1:13-CV-740
                                                                 (NAM/CFH)

    -against-


THE NEW YORK STATE OFFICE FOR PEOPLE
WITH DEVELOPMENTAL DISABILITIES,
CATHY TURCK, in her official capacity and
individually, and CATHY LABARGE, in her official
capacity and individually,

                          Defendants.

_____

**APPEARANCES:**                                             **OF COUNSEL:**

SADOWSKI FISCHER, P.L.L.C.                      Robert W. Sadowski, Esq.
39 Broadway, Suite 1540
New York, New York 10006
*Counsel for Plaintiff*

ERIC T. SCHNEIDERMAN                             Michael G. McMartin, Esq.
Attorney General of the State of New York          Assistant Attorney General
The Capitol
Albany, New York 12224
*Counsel for Defendants*

NORMAN A. MORDUE, Senior U.S. District Judge:

## MEMORANDUM DECISION AND ORDER

## I.    INTRODUCTION

     This is a civil action brought by plaintiff Jane A. Taylor against defendants the New York State Office for People with Developmental Disabilities ("OPWDD"), Cathy Turck, Treatment Team Leader, in her official capacity and individually ("Turck"), and Director of Labor Relations Capital District Cathy LaBarge, in her official capacity and individually ("LaBarge") under 42 U.S.C. § 1983, for violation of plaintiff's First, Fifth and Fourteenth Amendment Rights under the United States Constitution, as well as for breach of contract, retaliation, and for defamation.

Presently is a motion by defendants to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12 (b) (1) and for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12 (b) (6). Plaintiff opposes defendants' motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The facts, according to the complaint, are these: Plaintiff has worked for OPWDD since 1987. Until November, 2008, she was a developmental aide. At all times relevant to this complaint she was employed by OPWDD in the Capital District on a permanent tenured civil service basis, initially as a "Developmental Aide." She has never received a bad evaluation, and after receiving her bachelor's degree in 2004, she was eventually promoted to "Residential Habitation Specialist," Grade 14, a clinical position, in 2008. As such, she has a vested property interest in her continued employment with respect to which she cannot lawfully suffer a deprivation without first being accorded a pre-deprivation hearing consistent with due process. During her 27 years at OPWDD, she has been vocal in reporting incidents of abuse, and incidents in which other employees have not conformed to OPWDD's policies and procedures. As a result, she has been chastised, formally counseled, and has received notices of discipline - all for reporting inappropriate actions on behalf of her co-workers, either towards clients, or towards each other. Moreover, when reporting inappropriate behavior on the part of other OPWDD employees, she has received multiple notices of discipline for "false allegations," with no indication as to how it was determined that plaintiff's version of events, was, in fact false, and the other party's was true.

Retaliation against plaintiff has escalated since she was quoted in a New York Times article regarding the failure of OPWDD to keep reports to the ombudsman confidential, when it

2

became clear that three incidents of abusive behavior by fellow employees, which she had reported confidentially to the ombudsman, had been shared with OPWDD management. Ironically, after engaging a law firm to represent her regarding the retaliation, the actions taken against plaintiff by the OPWDD became even more outrageous, including receiving a reprimand for moving a chair from a hallway into a classroom.

Defendant OPWDD is responsible for coordinating services for more than 126,000 New Yorkers with developmental disabilities, including intellectual disabilities, cerebral palsy, Downs's syndrome, autism spectrum disorders, and other disabilities. It provides services directly to such individuals and through a network of approximately 700 nonprofit service providing agencies, with about 80 percent of services provided by the private not-for-profits and 20 percent provided by state-run services. Beneficiaries of OPWDD services are typically Medicaid eligible. OPWDD, formerly known as the Office of Mental Retardation and Development Disabilities ("OMRDD"), was authorized by the New York Mental Hygiene Law to provide services to individuals with disabilities and to adopt governing regulations. OPWDD adopted regulations concerning the provision of services to individuals with developmental disabilities and requirements for providers who receive Federal, New York State, and Medicaid funding. OPWDD facilities receive state and federal funding. New York State regulations also require that developmental disability programs must provide adequate, appropriate and supervised services to disabled individuals, including by implementing an individualized plan of service, and properly evaluating the appropriateness and effectiveness of the services as well as the residents' satisfaction with them.

Defendant Cathy LaBarge is the Director of Labor Relations of OPWDD for the Capital District Developmental Disabilities Services Office ("DDSO"). She works at the Office of

Human Resources, in Schenectady, New York. Defendant Cathy Turck is an employee of OPWDD, and is a Treatment Team Leader. Turck was plaintiff's supervisor. Plaintiff asserts upon information and belief that defendants LaBarge and Ms. Turck are close friends.

In 2011, plaintiff reported to the ombudsman three separate incidents regarding the inappropriate behavior of her co-workers. In one incident, plaintiff stated that she witnessed a fellow employee cursing at a client. In another incident, plaintiff stated that she witnessed a fellow employee taking sick clients outside to sit in a van on a very hot day. In a third incident, plaintiff received an email from the group home psychologist stating that one of the clients was joining the circus."

After making these reports to the ombudsman, plaintiff received a "Formal Counseling" from her supervisor, defendant Turck, the Treatment Team Leader. Defendant Turck accused plaintiff of not following the appropriate chain of command and not following appropriate protocol when reporting these incidents. Plaintiff also received a "Formal Counseling" for ordering a fish tank for a client. After a meeting with the team of employees, the consensus of the team was that they should order a salt water fish tank for one of the clients. Plaintiff was given the task of ordering the fish tank. In an absurd turn of events, plaintiff later received a "Formal Counseling" from defendant for ordering the fish tank without authority.

Some months after reporting the allegations, and many months after the alleged incident took place, plaintiff received a formal "Notice of Discipline" accusing her of making a "false claim" that a co-worker swore at her during a telephone conversation (the "2011 NOD"). Plaintiff's supervisor, rather than being concerned that a colleague, known among the staff for being rude, defiant, and for cursing, had sworn at plaintiff, issued the Notice of Discipline to plaintiff. The Notice of Discipline referred to a prior finding of "guilt" in 2004, also for "falsely"

4

reporting that another employee had used profanity.  However, in 2004, when plaintiff was disciplined for this "false accusation," OPWDD and plaintiff settled the matter.  The terms of the settlement included reducing the Notice of Discipline (the "2004 NOD") to a formal counseling, and mandated removal from plaintiff's file after two years (the "2004 Settlement").  Contrary to the terms of the 2004 Settlement, however; and unbeknownst to plaintiff, the 2004 NOD remained in plaintiff's file, and was still there in 2011 when the 2011 NOD was issued.  Upon receiving the 2011 NOD, which referred to the 2004 NOD, plaintiff insisted that it be removed from her personnel file.  Eventually, defendant LaBarge removed it from plaintiff's file, and removed the information regarding it from the 2011 NOD, but the damage was done.  The damaging information had been in her personnel file for 7 years, during which time plaintiff was perceived as a liar by those who had access to her personnel file.  Indeed, during this time period, plaintiff had posted for another position within OPWDD for which she was qualified, and was never even offered an interview, much less the position.  Plaintiff was told she didn't follow proper procedure.  Plaintiff filed a grievance regarding the 2011 NOD, which is in the process of being resolved.

About six months after receiving the string of formal counseling memos and the Notice of Discipline, the New York Times quoted plaintiff in an article regarding the fact that confidential reports of abuse made to the ombudsman were being shared with her supervisors and that she was, as a result, being retaliated against.  Despite the New York Times article, the retaliation continued, and, in fact, escalated.  Defendant Turck constantly asks other employees about plaintiff's whereabouts, and frequently requests that plaintiff report to her at the office at the end of a day's work at a residential facility.  Plaintiff contends upon information and belief, that defendant Turck does not keep tabs on the "coming and goings" of other OPWDD employees

5

who work in the various residential homes, nor does she request that they report to the office after a day in the field.

More recently, plaintiff received a Notice of Discipline (the "2013 NOD) regarding her complaint that a psychologist had inappropriately touched a client on the shoulder in a meeting. The 2013 NOD states that plaintiff made "false accusations of inappropriate contact between a co-worker and [a client]." Upon receiving the 2013 NOD, plaintiff filed a grievance and hired counsel to represent her with regard to the harassment and retaliation she has suffered, and continues to suffer, at the hands of defendants. Plaintiff contends that as soon as she informed OPWDD that her present counsel would be representing her, the retaliation escalated even more, "with even more absurd results." Indeed, plaintiff asserts that she "was promptly put on paid administrative leave."

Plaintiff initiated a complaint of discrimination with the New York State Division of Human Rights ("DHR") on or about September 6, 2011, against both OPWDD and defendant Turck. Following an investigation, on February 29, 2012, the DHR concluded that there was no probable cause to believe that defendants had engaged in or are engaging in unlawful discriminatory conduct. Thereafter, plaintiff commenced the instant action asserting that defendants have violated her Fifth and Fourteenth Amendment Rights under the United States Constitution. Plaintiff also alleges that defendants violated the 2004 settlement agreement, unlawfully retaliated against her and defamed her.

### III.     DISCUSSION

A.     Standards of Review

The standards applicable to motions to dismiss are well-settled. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12 (b) (1) when the district court

lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The standard for reviewing a 12 (b) (1) motion to dismiss is essentially identical to the 12 (b) (6) standard set forth below, except that "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* at 113. In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12 (b) (1), the court may consider matters outside the pleadings. *See Makarova*, 201 F.3d at 113.

On a motion to dismiss pursuant to Fed. R. Civ. P. 12 (b) (6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). In addition, the Court may not dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nettis v. Levitt*, 241 F.3d 186, 191 (2d Cir. 2001) (quotation omitted). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

B. Eleventh Amendment

According to defendants, under the Eleventh Amendment of the Constitution and the principles of sovereign immunity, this Court lacks subject matter jurisdiction over this lawsuit, because: (1) regardless of plaintiff having sued the individually named defendants in both their individual and official capacities, the claims implicate the State and are thus barred by the

7

Eleventh Amendment; and (2) plaintiff makes no request for prospective relief to address ongoing constitutional violations.

As an initial matter, the Court first observes that within the Second Circuit, the question of whether a motion to dismiss made on sovereign immunity grounds should be reviewed under Rule 12 (b) (1) or under Rule 12 (b) (6) remains unresolved. *See Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit.") (citing *Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998)); *see also Garcia v. Paylock*, 13–CV–2868 KAM, 2014 WL 298593, at *2 n. 3 (E.D.N.Y. Jan.28, 2014) ("It is an open question in the Second Circuit whether the claims of sovereign immunity should be viewed as raising a question of subject matter jurisdiction, and thus be evaluated under Rule 12 (b) (1), or as an affirmative defense analyzed under Rule 12 (b) (6).").

This "distinction is significant," because "while [a district court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed. R. Civ. P. 12 (b) (6), . . . in adjudicating a motion to dismiss for lack of subject-matter jurisdiction [pursuant to Fed. R. Civ. P. 12 (b) (1) ], a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 (2d Cir. 2007) (citations omitted). As such, in accordance with the approach taken by other district courts within this Circuit, the Court will apply the stricter standard set under Fed. R. Civ. P. 12 (b) (6) while analyzing defendants' sovereign immunity arguments. *See Tiraco v. New York State Bd. of Elections*, No. 12–CV–2273 (KAM) (MDG),

8

2013 WL 4046257, at *4 n. 6 (E.D.N.Y. Aug.7, 2013) (noting that "[t]his distinction [ ] does not alter the outcome" of the case because "the court [ ] considered only the pleadings and the relevant state and federal law and [drew] all inferences in Plaintiff's favor") (citations omitted); *McMillan v. N.Y. State Bd. of Elections*, No. 10–CV–2502 (JG) (VVP), 2010 WL 4065434, at *3 (E.D.N.Y. Oct. 15, 2010) (looking "only to the pleadings and to state and federal law" to resolve questions regarding sovereign immunity).

Under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI; *see also Gollomp v. Spitzer*, 568 F.3d 355, 365 (2d Cir. 2009). "Although by its terms the Amendment applies only to suits against a State by citizens of another State," the Supreme Court has consistently "extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases); *see also Daigneault v. Judicial Branch, Connecticut*, 309 Fed. App'x 518, 519 (2d Cir. 2009) ("[T]he Eleventh Amendment bars suits against a nonconsenting state in federal court brought by a state's own citizens or citizens of another state.") (citing *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)); *CSX Transp., Inc. v. New York State Office of Real Prop. Servs.*, 306 F.3d 87, 94 (2d Cir. 2002) ("In addition to its explicit restriction of suits by 'Citizens of another State,' the Eleventh Amendment has been construed to protect an unconsenting state from suit by its own citizens.' ") (quoting *Edelman*, 415 U.S. at 662–63); <u>Tiraco</u>, 2013 WL 4046257, at *4 ("The Supreme Court has long held that the Eleventh Amendment bars suits against a state by one of its own citizens.") (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)).

9

In other words, "the Eleventh Amendment means that, as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Gollomp*, 568 F.3d at 366 (citation and internal quotation marks and alterations omitted); *see also Miller v. Carpinello*, No. 06 Civ. 12940 (LAP), 2007 WL 4207282, at *2 (S.D.N.Y. Nov.20, 2007) ("The Eleventh Amendment bars suits in federal court by citizens against a state and its agencies, absent waiver of immunity and consent to suit by the state or abrogation of constitutional immunity by Congress.").

Further, a suit for damages against a state official in his or her official capacity "is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). However, "the applicability of the Eleventh Amendment bar [to suits against individuals in their official capacities] depends on the form of relief sought." *Lee v. Dep't of Children & Families*, 939 F. Supp.2d 160, 165–66 (D. Conn. 2013). Money damages cannot be recovered from state officers sued in their official capacities. *See e.g.*, *Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against an official but rather is a suit against the official's office."); *Edelman*, 415 U.S. at 663 ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *Goonewardena v. New York*, 475 F. Supp.2d 310, 329 (S.D.N.Y. 2007) ( "[S]overeign immunity also extends to bar claims for monetary damages brought against state officers sued under section 1983 in their official capacities.").

Similarly, "judgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993) (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985)). However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law. *See Edelman*, 415 U.S. at 663; *Ex Parte Young*, 209 U.S. 123, 28 (1908). In this regard, through the doctrine of *Ex Parte Young*, a party may bring "a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law." *CSX Transp., Inc.*, 306 F.3d at 98 (internal quotation marks and alteration omitted); *see also Arthur v. Nyquist*, 573 F.2d 134, 138 (2d Cir.1978).

Based on this analysis, the Eleventh Amendment bars plaintiff's claims against OPWDD and all claims for compensatory and punitive damages against defendants LaBarge and Turck in their official capacities. *See Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2004) ("state officials cannot be sued in their official capacities for retrospective relief under section 1983"); *Molina v. New York*, 697 F. Supp. 2d 276, 283 (N.D.N.Y. 2010) ("[i]t is well settled that the Eleventh Amendment bars suits against a state or its agencies," therefore "[p]laintiff's claims against the State of New York and OCFS, a state agency, are dismissed"); *McGregor v. Goord*, 18 F. Supp. 2d 204, 210 (N.D.N.Y. 1998) ("To the extent that plaintiff is seeking damages in the form of back pay, those damages are barred by the Eleventh Amendment."). In plaintiff's third cause of action, she asserts a claim against OPWDD on the basis of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Even if the alleged unconstitutional policy or practice she sets forth herein is sufficient to adequately state a cause of action under *Monell*, her claim is barred under the Eleventh Amendment as OPWDD is indisputably an official agency of the State of New York.

Plaintiff does not assert any prospective claims for injunctive relief in her complaint. She does, however, raise claims for compensatory and punitive damages against the individually named defendants in their personal capacities which are not barred by the Eleventh Amendment. *See Alden v. Maine*, 527 U.S. 706, 757 (1999) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.").

C.  Plaintiff's First Amendment Retaliation Claim

To state a *prima facie* case of First Amendment retaliation under § 1983, a plaintiff must demonstrate (1) the speech at issue was constitutionally protected; (2) plaintiff suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action so that it can be said that the speech was a motivating factor in the determination. *See Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). "[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] as a citizen on a matter of public concern.' " *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). "A matter of public concern is one that 'relat[es] to any matter of political, social, or other concern to the community.' " *Id.* (alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). " 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.' " *Id.* (quoting *Connick,* 461 U.S. at 147–48). "Among the relevant considerations is whether the speech was calculated to redress personal grievances or whether it had a broader

12

public purpose." *Id.* (internal quotation marks omitted). "The question of whether a public employee spoke . . . on a matter of public concern is a question of law." *Singer*, 711 F.3d at 339.

In *Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir.2008), the Second Circuit described the "heart" of the public concern inquiry as "whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.' " *Id.* at 189 (quoting *Lewis v. Cowen*, 165 F.3d 154,163–64 (2d Cir. 1999). A year later, however, the Court clarified that "the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern," *Sousa v. Roque*, 578 F.3d 164, 171 (2d Cir. 2009) (quoting *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006)); that is, "it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern." *Id.* at 174. Notwithstanding that admonition, the Circuit adhered to the principle that "[a]n employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking 'upon matters only of personal interest.' " *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

Defendants contend that plaintiffs allegations of being disciplined after making reports of alleged abuse to OPWDD's ombudsman cannot be retaliation under the First Amendment as a matter of law because as an employee of OPWDD, she was **required** to report such abuse. Thus, plaintiff's speech was actually part of her "job duties" and consequently it was not entitled to First Amendment protection. *See Garcetti*, 547 U.S. at 421. *See also Weintraub v. Bd. of Educ. of City Sch. Dist.*, 593 F.3d 196, 204 (2d Cir. 2010) (citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (holding that when public employee raises complaints or concerns up chain of command at his workplace about his job duties, that speech is undertaken in course of performing his job)). Plaintiff does assert in her complaint that she received "formal counseling" after

13

making three reports of suspected abuse to the OPWDD ombudsman. While she clearly was required to make these reports pursuant to the terms of her employment, *see* 14 N.Y.C.R.R. § 624.5 (b) (1) (ii), ("[A]ny allegation of abuse shall be reported immediately (but no later than 24 hours) upon observation or discovery to the chief executive officer (or designee"), she was not required to make statements to reporters from the New York Times. And yet in paragraph 4 of her complaint she avers that retaliation has "escalated" since she was quoted in a New York Times article. Defendants cannot seriously argue that she was required to make comments to reporters from the New York Times as part of her job with OPWDD. To the extent that plaintiff's First Amendment retaliation claims are based on statements she made to reporters at the New York Times, the Court finds that they are potentially protected speech claims under the First Amendment.

Defendants, however, contend that plaintiff has failed to plead her First Amendment retaliation claim for lack of a material adverse employment action. Plaintiff contends that the "Formal Counseling" she received after speaking to the ombudsman was a material adverse action. Defendants cite *Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 570 (2d Cir. 2011) in support of their contention that counseling is not a material adverse action as a "matter of law." There, the Second Circuit held that "even assuming the counseling rose to the level of some form of criticism, . . . in the context of . . . issuance of a 'counseling memo,' . . . criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action". *Id.* In addition to complaining about the "Formal Counseling" memo, plaintiff also contends that defendant Turck monitors her job duties too closely by "asking other employees about her whereabouts" and "request[ing] that [plaintiff] report to her at the office at the end of a day's work." "District

14

courts within the Second Circuit have often found ... 'that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.' " *Lyman v. NYS OASAS*, 928 F. Supp.2d 509, 520 (N.D.N.Y. 2013) (citing *Abraham v. Potter*, 494 F. Supp.2d 141, 147–48 (D. Conn. 2007) (quoting *Honey v. Cnty. of Rockland*, 200 F. Supp.2d 311, 320 (S.D.N.Y. 2002)).

But "[i]n the context of a First Amendment retaliation claim, [the Second Circuit] ha[s] held that the term "adverse employment action" may have "a different meaning in free speech retaliation cases than in Title VII and other discrimination cases." *Zelnick v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir. 2006). "Retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Id.* (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d. Cir. 2004) (balance of citations omitted). "In this context, '[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' *Id.* (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). "This list of retaliatory conduct is certainly not exhaustive, however, and "lesser actions may also be considered adverse employment actions." *Id.* "Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Id.* (citing *Bernheim v. Litt*, 79 F.3d 318, 324–26 (2d Cir.1996)).

Here, plaintiff claims that OPWDD issued three Notices of Discipline ("NOD") to her - one in 2004, one in 2011 and one in 2013. Plaintiff asserts that she "settled" the 2004 NOD with

15

OPWDD and the agency was supposed to have been removed it from her personnel file after two years. Plaintiff discovered upon receipt of the 2011 NOD which referred to the 2004 NOD finding of "guilt" that the 2004 NOD had not been removed from her file. Thus, she asserts that "damaging information had remained in her personnel file for seven years." It is undisputed that plaintiff is still employed at OPWDD, and she has not been demoted. It is also true that according to plaintiff's own allegations, she has "never received an adverse employment review." However, plaintiff also asserts in her complaint that "during this time period" she posted for another position within OPWDD for which she was qualified and was not offered an interview. Indeed, plaintiff avers that she was told "she didn't follow proper procedure." These conclusory allegations are sufficient at the pleading stage to support her claim for an adverse employment action. As such, the Court will deny defendants' motion to dismiss plaintiff's first cause of action for retaliation pursuant to the First Amendment.

D.  Equal Protection

Plaintiff's second cause of action asserts that "[b]y reason of [her] whistleblowing activities, [defendants] have singled out Plaintiff for irrational differential treatment." Defendants contend that plaintiff's equal protection claims are barred by the U.S. Supreme Court's decision in *Engquist v. Oregon Dep't of Agric*., 553 U.S. 591 (2008). In *Engquist*, the Supreme Court held that a public employee does not state a claim under the Equal Protection Clause by alleging that he or she was arbitrarily treated differently from other similarly situated employees unless the different treatment was based on the employee's membership in a particular protected class. *See id.* at 606-07. Plaintiff raises no opposition to defendants' arguments in her opposing papers. Since the Court finds no allegations in the complaint that plaintiff was a member of a specific protected class, the Court will dismiss her Fourteenth Amendment Equal Protection Claim.

16

E.  Constructive Discharge

In plaintiff's fourth cause of action she asserts that she was constructively discharged from her employment position. "Constructive discharge" as a doctrine converts an employee's voluntary resignation into a discharge by the employer. *See, e.g.*, *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983). Plaintiff is still employed by OPWDD; she has not been discharged, actually or constructively. *See Tavoloni v. Mount Sinai Medical Center*, No. 98-9640, 1999 WL 972656, at *2 (2d Cir. Oct. 1, 1999). This claim must be dismissed.

F.  Breach of Contract

Plaintiff's fifth claim is for breach of contract for terms of the "2004 Settlement." She asserts that defendant OPWDD "represented by defendant LaBarge issued a Notice." There are two fatal defects with plaintiff's breach of contract claim. First, as referenced by defendants, the statute of limitations for breach of contract is six years and plaintiff did not commence this action until 2013. According to the facts asserted in her complaint, defendants breached the alleged contract by not removing the NOD from plaintiff's personnel file in 2006. Thus her breach of contract claim arose sometime in 2012. Plaintiff could argue that equitable tolling or estoppel should bar defendants from raising a statute of limitations defense in this case. *See Soroof Trading Development Co., Ltd. v. GE Fuel Cell*, 842 F. Supp.2d 502, 517 ( S.D.N.Y. 2012) ("[U]nder the equitable tolling doctrine, a statute of limitations does not run against a plaintiff who was justifiably ignorant of his cause of action," and "the doctrine of equitable estoppel may toll a statute of limitations where defendant's misconduct caused him to delay bringing suit.") (quoting *Access Northern Sec. Corp. v. Linear Corp.*, 97 Civ. 2937, 1998 WL 566815, *5 (S.D.N.Y. Sept. 4, 1998) (citations and some internal punctuation omitted).

17

However, this claim asserts essentially that "State officials violated state law in carrying out their official responsibilities." *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 968 (2d Cir. 1984). As such, it is a pendent state law claim barred by the Eleventh Amendment. *See id.* Thus, the Court must dismiss plaintiff's breach of contract claim.

G.   State Whistleblower Claim Under N.Y. Civil Service Law § 75-b

Plaintiff's sixth cause of action against defendants asserts a claim under § 75-b of the N.Y. Civil Service Law. However, "on its face, section 75–b only provides a cause of action against government entities, not individuals, because it does not include individuals in its definition of public employer." *Fry v. McCall*, 945 F. Supp. 655, 666 (S.D.N.Y. 1996). Thus, plaintiff cannot maintain an action against the individually named defendants under § 75-b and her claim against defendant OPWDD is barred by the Eleventh Amendment. Consequently, the Court must dismiss her claim for violation of retaliation under § 75-b of the N.Y. Civil Service Law.

H.   Defamation

Plaintiff's seventh cause of action asserts that defendant LaBarge "allowed the 2004 NOD, which branded [plaintiff] as a liar, in her personnel file." Under New York law, the statute of limitation for a defamation claim is one year. *See* N.Y. C. P. L.R. § 215 (3). This time period is measured from the date of the original publication or utterance of the allegedly defamatory statement. *See Monsour v. New York State Office for People with Developmental Disabilities ("OPWDD")*, No., 1:13-CV-0336, (TJM) 2014 WL 975604 (N.D.N.Y. March 12, 2014) (citing *Nussenzweig v. diCorcia*, 9 N.Y.3d 184, 188 (2007); *Wilson v. Erra*, 94 A.D.3d 756, 756 (2nd Dept. 2012) ("A cause of action alleging defamation accrues at the time the alleged statements are originally uttered.")). Oddly enough, *Monsour* involved a plaintiff employed at OPWDD suing the same defendant - Cathy LaBarge - who plaintiff is suing in the present case. "While 'each

18

separate act of [defamation] in a series is in and of itself a distinct and complete wrong and constitutes a different cause of action,' " *id.* (quoting *Knoll v. Merrill Corp.*, No. 02 Civ 566 (CSH), 2003 WL 22682271, at *4 (S.D.N.Y. Nov. 13, 2003)), "plaintiff has not alleged that LaBarge published separate and distinct defamatory statements, but only that the originally published e-mail remained in his personnel file. This fails to establish separate acts of publication." *Id.* Likewise, in the present case, plaintiff merely asserts that the 2004 NOD remained in her personnel file from 2004 to 2011. Thus, her defamation claim accrued at the time the alleged defamatory statements were made in 2004 and her claim must be dismissed.

I.   Federal False Claims Act

Plaintiff's eighth claim against defendants LaBarge and Turck is premised on retaliation under the so-called "whistleblower" provisions of the federal False Claims Act, 31 U.S.C. § 3730 (h). However, an individual may not be sued under § 3730 (h) either in an individual or official capacity; liability may only be imposed on employers. *See Monsour*, 2014 WL 975604, at *10 (citing *Fisch v. New Heights Academy Charter Sch.*, No. 12–cv–2033, 2012 WL 4049959, at *4 (S.D.N.Y. Sep.13, 2012); (" Section 3730(h) imposes liability only on employers."); *Aryai v. Forfeiture Support Assocs., LLC*, No. 1:10–cv–08952, 2012 U.S. Dist. LEXIS 125227, at *12–13 (S.D.N.Y. Aug. 27, 2012) (" section 3730 (h) does not apply to individuals")).; *U.S. ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp.2d 613, 624–25 (S.D.N.Y. 2006) (holding that "only employers can incur liability under § 3730 (h)")).

Thus, plaintiff's claim pursuant to the federal False Claims Act must be dismissed.

J.   New York False Claims Act

Plaintiff's ninth cause of action raises similar claims against LaBarge and Turck under the New York False Claims Act, N.Y. State Fin. Law § 191. Section 191 "is essentially identical in

19

language and substance to its federal counterpart," *Monsour*, 2014 WL 975604, at *10 n. 9 (citing *Forkell v. Lott Assisted Living Corp.*, No. 10–cv–5765, 2012 WL 1901199, at *14 (S.D.N.Y. May 21, 2012), and "courts interpret [the former] by closely tracking judicial interpretation of [the latter]. (balance of citations omitted)). Section 191 (1) of the New York False Claims Act includes the word employer and, as such, unambiguously precludes liability attaching to individual defendants. *Id.*

Consequently, plaintiffs claims against defendants LaBarge and Turck under the New York False Claims Act must be dismissed.

## IV. CONCLUSION

Based on the forgoing, it is hereby

ORDERED that defendants motion to dismiss the complaint (Dkt. #12) is GRANTED in part and DENIED in part; and it is further

ORDERED that all claims against defendant OPWDD are dismissed with prejudice; and it is further

ORDERED that all claims against defendants LaBarge and Turck in their official capacities are dismissed with prejudice; and it is further

ORDERED that all claims against defendants LaBarge and Turck in their individual capacities are dismissed with prejudice except plaintiff's first cause of action for violation of her First Amendment rights in retaliation for speaking to the New York Times.

IT IS SO ORDERED.

Date: March 24, 2014

Norman A. Mordue
Senior U.S. District Judge

20