**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JANE A. TAYLOR,**

                    **Plaintiff,**

        **v.**                                                                **1:13-cv-740 (NAM/CFH)**

**THE NEW YORK STATE OFFICE FOR PEOPLE WITH**
**DEVELOPMENTAL DISABILITIES, CATHY TURCK,**
**and CATHY LABARGE,**

                    **Defendants.**
_____

**APPEARANCES:**

Robert W. Sadowski, Esq.
Raphael Katz, Esq.
Sadowski Katz LLP
11 Broadway, Suite 615
New York, NY 10004
and
Stephen Bergstein
Bergstein & Ullrich, LLP
5 Paradies Lane
New Paltz, NY 12561
Attorneys for Plaintiff

Eric T. Schneiderman,
Attorney General of the State of New York
Michael G. McCartin,
Assistant Attorney General
Office of the Attorney General
The Capitol
Albany, NY 12224
Attorney for Defendants

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

# I.     INTRODUCTION

Plaintiff Jane A. Taylor brings this action alleging violations of her rights while she was employed by Defendant New York State Office for People with Developmental Disabilities ("OPWDD").  Plaintiff asserts three claims against OPWDD and its employees Cathy Turck and Cathy LaBarge.  (Dkt. No. 58).  In Count I, she alleges that Defendants Turck and LaBarge retaliated against her for exercising her right to freedom of speech, in violation of the First Amendment.  (*Id.* at ¶¶ 50–55).  In Count II, she alleges that Defendant OPWDD unlawfully retaliated against her in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  (*Id.* at ¶¶ 56–61).  In Count III, she alleges that Defendants Turck and LaBarge "wrongfully aided and abetted in discrimination against Plaintiff" in violation of New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*  (*Id.* at ¶¶ 117–18).

Now pending before the Court is Defendants' motion seeking sanctions or alternatively summary judgment.  (Dkt. No. 79).  For the reasons stated below, the motion is denied as to sanctions and granted as to summary judgment.

# II.     BACKGROUND[1]

## A. The Parties' Roles

Plaintiff is a former Residential Habilitation Specialist for Defendant OPWDD, an agency of the State of New York which coordinates services for individuals with developmental disabilities.  (Dkt. No. 79-35, ¶¶ 1–2).  Plaintiff worked at OPWDD for 29 years and was scheduled to retire on August 23, 2015.  (Dkt. No. 89-3, ¶ 1).  As a Rehabilitation Specialist, her responsibilities included "taking consumers on outings, supervising a day classroom and

---

[1] The facts stated herein are drawn from the parties' submissions, including their Statements of Material Facts and Responses, as well as exhibits that the parties have submitted, to the extent that they are admissible as evidence.  Where facts stated in a party's L.R. 7.1(a)(3) Statement are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party, the Court has found such facts to be true.  *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

teaching living skills." (*Id.*).  Defendant LaBarge is OPWDD's former Director of Labor

Relations; she is now retired.  (Dkt. No. 79-35, ¶ 3).  Defendant Turck was a Treatment Team

Leader and Plaintiff's supervisor from September 2008 until January 2012.  (*Id.* at ¶ 4).

According to Defendant LaBarge, as Director of Labor Relations, she was responsible

for arranging and assisting in conducting interrogations, occasionally did some investigations,

oversaw the grievance process and the arrest process for employees, monitored driver's license

suspensions, served Notices of Discipline, and assisted in arbitration hearings.  (Dkt. No. 88-6,

p. 12).  She states that she was "not personally involved in any  decision to counsel the plaintiff

and issue a Formal Counseling Memo or a Notice of Discipline (NOD)."  (Dkt. No. 79-10, ¶ 9).

Defendant Turck states that, as Treatment Team Leader, she was responsible for eight

Individualized Residential Alternative ("IRA") homes, where individuals in the care of

OPWDD ("clients") live and where professional care is provided to them.  (Dkt. No. 79-12, ¶

3).  When she was Plaintiff's supervisor, Defendant Turck "formally counseled her and issued

memorandums of such counselings when the circumstances warranted."  (*Id.*, ¶ 9).

### B.  2004 Notice of Discipline

On March 9, 2004, Plaintiff was issued a NOD, which charged her with making false

allegations against a co-worker, Laurie Zack, on two occasions in 2003.  (Dkt. No. 79-3, pp. 5–

6).  On September 23, 2005, Plaintiff agreed to a settlement of the NOD, whereby she received

a Letter of Reprimand, which went into her personnel file, along with the NOD.  (*Id.*, pp. 1–3).

The NOD was supposed to be removed from her file after a period of two years.  (*Id.*, p. 3).

### C.  2010 Counseling Memo

On June 3, 2010, Plaintiff was counseled again, and then, on August 25, 2010, she was

issued a formal counseling memo regarding that meeting.  (Dkt. No. 79-35, ¶ 35).  The

counseling memo, from Defendant Turck, states that Plaintiff was "being formally counseled for an attitude that bordered on insubordination." (Dkt. No. 79-3, p. 8). Defendant Turck wrote that Plaintiff had improperly authorized the purchase of an expensive fish tank for an OPWDD client and when Turck reviewed with Plaintiff the policy and procedure for such expenditures, Plaintiff "became defensive, argumentative, and repeatedly interrupted." (*Id.*, p. 7). Plaintiff testified that it was Defendant Turck who was being "rude" during the meeting. (Dkt. No. 79-2, p. 70).

Plaintiff filed an administrative grievance about the counseling memo, requesting that it be removed from her personnel file because she did nothing wrong. (Dkt. No. 79-3, pp. 10–11). The grievance was denied and the hearing officer found that Plaintiff failed to show, among other things, that the counseling memo was substantially inaccurate or "any evidence of harassment or retaliatory treatment by management." (*Id.*, p. 12).

### D. Plaintiff's Complaints to Ombudsperson

On July 28, 2010, Plaintiff made reports of alleged abuse of OPWDD clients to the OPWDD Ombudsperson. (Dkt. No. 79-35, ¶¶ 54, 70). According to Defendant Turck, the Ombudsperson "accepts concerns regarding the individuals that we provide services to, and then she follows-up on those concerns." (Dkt. No. 88-9, p. 25). The Ombudsperson at the time was Carrie Sonthivongnorath, who worked for OPWDD. (Dkt. No. 79-2, p. 43; Dkt. No. 88-4, p. 30). Plaintiff told the Ombudsperson about at least three incidents: on one occasion a co-worker yelled at an OPWDD client, identified as A.B., for having ice cream in front of other clients; another time clients were left in a van too long on a hot day, and further, a co-worker once joked in an internal email that A.B. "is joining the circus." (Dkt. No. 79-35, ¶¶ 56, 58, 60; Dkt. No. 79-2, pp. 103–06). That email arose in a discussion about A.B. refusing to attend an OPWDD

outing to the circus. (Dkt. No. 88-9, pp. 79–80). Plaintiff also apparently complained that A.B. was not allowed to go to the movies on one occasion, a decision made by OPWDD officials due to "her recent non-compliance" with the circus outing. (*Id.*, pp. 77–80). Plaintiff testified that it was part of her duties as an employee of OPWDD to report abuse, including reporting to the Ombudsperson. (Dkt. No. 79-2, pp. 43–45).

Plaintiff believed that her reports to the Ombudsperson were confidential. (Dkt. No. 88-13, p. 54). According to Cheryl Greiner, an official at OPWDD, Ms. Sonthivongnorath informed her about Plaintiff's concerns, and Ms. Greiner asked "who was initiating the allegations, so that there could be a progression of an investigation, and she just told me." (Dkt. No. 88-4, p. 25). Ms. Greiner then told the OPWDD investigative office and initiated an incident report based on what was being alleged. (*Id.*, pp. 25, 31). Ms. Greiner testified that she did not report Plaintiff's identity to any of her subordinates. (*Id.*, p. 25). On April 26, 2011, the Ombudsperson sent an email to various OPWDD officials, including Defendant Turck, stating that she had received some concerns regarding A.B., specifically that "I am being told that her mother is being prevented from seeing her as often as she would like." (Dkt. No. 88-9, p. 76). The email did not mention Plaintiff. Defendant Turck testified that the Ombudsperson brought to her attention complaints regarding A.B., but she did not know that Plaintiff had made them. (Dkt. No. 88-9, pp. 24, 48; *see also* Dkt. No. 79-12, ¶ 12).

### E. 2011 NOD and Counseling Memo

On March 8, 2011, Plaintiff received another NOD, this one authored by Katherine Bishop, the Director of Program Development for OPWDD. (Dkt. No. 79-35, ¶¶ 41, 82). The underlying charge was that on August 18, 2010, Plaintiff made false allegations that a co-worker, Paula Toomey, used profanity toward her during a telephone conversation. (Dkt. No.

79-3, p. 32). Defendant Turck states that she had no personal involvement in this NOD. (Dkt. No. 79-12, ¶ 19). According to Defendant LaBarge, she personally served the March 8, 2011 NOD on Plaintiff, but she had no role in the decision to issue it. (Dkt. No. 79-10, ¶ 12). The original version of the NOD also referenced Plaintiff's 2004 NOD. (Dkt. No. 79-3, p. 32). When Plaintiff objected that the 2004 NOD was no longer supposed to be in her file, she was issued an amended NOD which did not reference it. (Dkt. No. 79-3, p. 33; Dkt. No. 79-2, pp. 95–96).

On May 24, 2011, Plaintiff received another formal counseling memo. (Dkt. No. 79-35, ¶ 38). Defendant Turck wrote in the memo that Plaintiff was counseled regarding her "failure to take proper action in reporting an incident." (Dkt. No. 79-3, p. 34). Specifically, the memo noted that on July 28, 2010, Plaintiff "made three separate allegations of abuse regarding individuals who reside at the McChesney Ave. IRA in Brunswick," which occurred on April 29, 2010, May 7, 2010, and July 14, 2010. (*Id.*). The memo stated that all three allegations, which Plaintiff had previously made to the Ombudsperson, were "disconfirmed by the investigator." (*Id.*). The memo faulted Plaintiff for not reporting the incidents in a timely, consistent, and accurate manner. (*Id.*).

According to Defendant Turck, she "formally counseled plaintiff that she was required to report any suspected improper treatment of individuals in the care of OPWDD in a timely manner, not after waiting months or weeks." (Dkt. No. 79-12, ¶ 12). Defendant Turck states that under New York law, any allegation of abuse was supposed to be reported immediately, and no later than 24 hours after discovery. (*Id.*, ¶ 13) (citing 14 NYCRR § 624.5(b)(1)(ii)). The OPWDD Policy Manual also required staff to immediately report such incidents to supervisors

in their chain of command. (Dkt. No. 79-9, p. 34). Plaintiff testified that she reported the incidents immediately. (Dkt. No. 79-2, pp. 111–12).

On July 20, 2011, Plaintiff took a medical leave from work on the basis of "job stress." (Dkt. No. 87, ¶ 33; Dkt. No. 88-13, p. 109).

### F.  Complaint to State

On or around September 6, 2011, Plaintiff filed a complaint with the New York State Division of Human Rights. (Dkt. No. 79-3, pp. 35–37). The complaint charged that OPWDD and Defendant Turck engaged in "an unlawful discriminatory practice relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of sex, sexual orientation, disability." (*Id.*, p. 35). Plaintiff alleged that Defendant Turck harassed her because of Plaintiff's disability (corneal abrasion), that Defendant Turck issued Plaintiff counseling memos and a NOD "because I am a heterosexual and my other coworkers, who have engaged in improper conduct, are homosexual," and that Defendant Turck was "romantically" interested in Plaintiff and made her "feel uncomfortable." (*Id.*, pp. 35–36). Plaintiff also alleged that Defendant Turck retaliated against her "due to sexual orientation." (*Id.*, p. 39).

After an investigation, the Division of Human Rights determined that there was no probable cause to believe that OPWDD or Defendant Turck "have engaged in or are engaging in the unlawful discriminatory practice complained of." (Dkt. No. 79-3, p. 69). Among other things, the Division of Human Rights could not corroborate Plaintiff's allegations of sexual harassment and found that Plaintiff had "been counseled and disciplined for legitimate, nondiscriminatory reasons relating to her work performance." (*Id.*, p. 70).

### G.  New York Times Article

On November 11, 2011, *The New York Times* published an article quoting Plaintiff,

entitled "For Disabled Care Complaints, Vow of Anonymity Was False."  (Dkt. No. 79-3, pp.

72–75).  The portion of the article relating directly to Plaintiff reads as follows:

> The Times learned of the ombudsman policy after a state employee, Jane Taylor,
> approached a reporter and said the ombudsman in the Albany area, Carrie
> Sonthivongnorath, had given her name to department officials.
>
> Ms. Taylor had reported several alleged episodes.  In one, she said, she witnessed
> a state worker cursing at a resident; in another, she saw a state worker taking sick
> residents outside to sit in a van on a particularly hot summer day.  In another, she
> was troubled after a state psychologist e-mailed several colleagues, including
> her, joking that a misbehaving resident was "joining the circus."
>
> Ms. Taylor, who develops and monitors daytime activities for residents in several
> group homes, said that not long after she reported the episodes, in summer 2010,
> Ms. Sonthivongnorath told her that she had revealed her name to a top official in
> the agency's Albany region.
>
> Ms. Taylor believes she was then retaliated against over several months.  She
> was required to attend counseling sessions with a supervisor, Cathy Turck; in a
> memorandum, Ms. Turck criticized Ms. Taylor for the way she reported the three
> episodes, saying "when reporting an incident, you must utilize your chain of
> command."  Ms. Taylor said she reported episodes to supervisors but was not
> taken seriously.
>
> Ms. Taylor was also served with a formal disciplinary charge in March, accusing
> her of making a false claim that a co-worker swore at her.  The disciplinary
> notice was issued eight months after the alleged episode occurred, and is
> unresolved.
>
> "You're supposed to be able to go to the ombudsman and report confidentially,
> but it didn't happen that way - she turned me in," Ms. Taylor said, adding, "The
> whole thing, in a nutshell, is that I went to the ombudsman, and they didn't like
> it."
>
> A second state employee who also works in the Albany area corroborated key
> parts of Ms. Taylor's story.  "She is being bullied, threatened, and totally
> retaliated against in so many different ways," the employee said, adding that Ms.
> Taylor was having difficulty even getting time off approved.  The employee
> spoke on the condition of anonymity for fear of retaliation.

(*Id.*, pp. 73–74).

### H.  2012 Events

On April 6, 2012, Defendant Turck emailed several OPWDD officials, including Defendant LaBarge, asking if Plaintiff would be disciplined for filing false claims against Turck as part of the complaint with the New York State Division of Human Rights.  (Dkt. No. 88-6, p. 137).  Defendant Turck wrote that "[k]nowing that she continues to follow a pattern of making false allegations against co-workers, I would think that we open ourselves up to liability if we do not take disciplinary action against her and she continues with this pattern."  (*Id.*). Defendant LaBarge forwarded the email to another OPWDD official, writing that "I wish she (Turck) would just let it go."  (*Id.*).

On or around November 6, 2012, Plaintiff reported that a co-worker, Angela Ertelt, had inappropriate contact with an OPWDD client.  (Dkt. No. 79-3, p. 85).  Referring to this allegation, Defendant LaBarge wrote in an email dated November 23, 2012 that: "This is Ms. Taylor's usual 'MO' . . . when she gets angry she files false allegations, which is actually what two prior NOD's referenced. (the second one was, unfortunately, removed from her PH file after a certain period of time. Whomever settled that NOD, I'd like to smack them.)."  (Dkt. No. 88-6, p. 143).  In the email thread, Defendant LaBarge referred to Plaintiff as an "obnoxious bitch."  (*Id.*, p. 142).  Defendant LaBarge also wrote that "Unfortunately, Central Office does not see this as a termination or demotion case."  (*Id.*, p. 154).  Defendant LaBarge testified that she wanted to "smack" the person who settled Plaintiff's prior NOD because "I seriously do not agree with removing NODs from personal history files."  (Dkt. No. 88-6, p. 82).  Further, she testified that some OPWDD officials "were looking to either demote or terminate Jane Taylor because she had been experiencing so many issues in our agency."  (*Id.*, p. 93).

### I.   2013 Events

On April 29, 2013, Plaintiff received another formal counseling memo, from Treatment Team Leader Jerome Brennan. (Dkt. No. 79-3, pp. 81–82). The memo alleged that Plaintiff yelled at and argued with a co-worker, Ms. Ertelt. (*Id.*). On May 9, 2013, she received another NOD, from Heidi-Lynn Wagner, the Acting Director of Employee Relations. (*Id.*, pp. 83–85). The NOD charged that Plaintiff made false allegations on November 6, 2012 regarding inappropriate contact between Ms. Ertelt and an OPWDD client. (*Id.*). Defendant LaBarge received an email about the NOD and responded: "Come here and let me kiss you!! I didn't send you her priors . . . do you have that information, or do you need it at this point?? I know that you are aware of her NOD that is pending resolution. Not sure what she has for formal counselings." (Dkt. No. 88-6, p. 165). Plaintiff testified that she went out on administrative leave from work as a result of the May 9, 2013 NOD. (Dkt. No. 79-2, p. 140). On June 24, 2013, Plaintiff commenced the present action. (Dkt. No. 1).

On July 25, 2013, a "Workplace Violence Prevention Episode Report" was initiated by James Fisher, the Program Director at Fort Edwards Day Habilitation Center. (Dkt. No. 79-3, pp. 86–89). The report stated that Plaintiff allegedly made a threatening comment to a co-worker, Lea Crosse, and followed her to another classroom. (*Id.*, p. 87). An investigation by OPWDD found that "there is sufficient evidence and corroboration of testimony to find that Jane Taylor made the threatening statement about Ms. Crosse on 7/24/13 and then engaged in threatening or stalking behavior toward her on 7/25/13 at Fort Edwards Day Habilitation Center." (*Id.*, p. 99).

On July 26, 2013, Plaintiff received another formal counseling memo, authored by Mr. Fisher. (Dkt. No. 79-3, pp. 107–08). According to the memo, Plaintiff came to work on July

19, 2013 wearing a short dress, after receiving training the day before regarding appropriate attire for the workplace. (*Id.*, p. 107).  Mr. Fisher instructed Plaintiff to go home and change clothes, but Plaintiff refused and called the police instead to report him for harassment.  (*Id.*). Plaintiff was counseled for insubordination, among other things.  (*Id.*).

On November 12, 2013, OPWDD official Cris Christodulu sent an email about starting a "HIPAA administrative Investigation" as to an allegation that Plaintiff "used [a] fax Machine to fax [an] individual's information to her lawyer based on paperwork found behind [in the] fax machine." (Dkt. No. 88-6, p. 170).  Defendants Turck and LaBarge were not on the receiving end of the email thread; an official was asked to contact LaBarge regarding "information from ISS on 3 faxes that went to her lawyer's number." (*Id.*).

### J.  2014 Events

On February 10, 2014, Treatment Team Liam Stander asked Plaintiff to attend a meeting.  (Dkt. No. 79-28, ¶ 5; Dkt. No. 79-35, ¶ 91).  But Plaintiff refused to meet with Mr. Stander.  (Dkt. No. 79-2, pp. 211–12).  On February 11, 2014, Plaintiff received another formal counseling memo, from Mr. Stander.  (Dkt. No. 79-3, pp. 105–06).  This one stated that on October 8, 2013, Plaintiff improperly used an OPWDD fax machine to send confidential clinical records to her attorney. (*Id.*).  According to the memo, Plaintiff's "attempt to disclose such records to a third party was in violation of the Mental Hygiene Law and HIPAA." (*Id.*).  The memo also stated that Plaintiff refused to attend a meeting about the counseling, which was insubordination.  (*Id.*).

On or about February 12, 2014, Treatment Team Leaders Liam Stander and Kristi Beitter attempted to meet with Plaintiff.  (Dkt. No. 79-3, p. 115; Dkt. No. 87, ¶ 60).  According to Ms. Beitter, they intended to "formally counsel Plaintiff and to notify her that she was being

placed on administrative leave pending investigation into an allegation that she failed to report

an abuse incident." (Dkt. No. 79-18, ¶ 4). Mr. Stander testified that the decision to place

Plaintiff on administrative leave was made by his supervisor, Margaret O'Brien. (Dkt. No. 88-

11, p. 35). Defendant LaBarge testified that she did not have any responsibility in determining

whether an employee should be placed on administrative leave. (Dkt. No. 88-6, p. 27).

According to Ms. Beitter and Mr. Stander, Plaintiff was insubordinate and refused to

cooperate at the meeting. (*See* Dkt. No. 79-3, pp. 115–16). Plaintiff admits that she walked out

of the meeting and called the police and her lawyer, allegedly because she felt threatened. (Dkt.

No. 79-2, pp. 164–71; Dkt. No. 79-5, pp. 8–9). Plaintiff was put on administrative leave and

told to leave the premises, which she ultimately did after police arrived. (Dkt. No. 79-3, pp.

115–16). A report of the incident, authored by an OPWDD Investigator, came to the following

conclusions:

1. Treatment Team Leaders Kristi Beitter and Liam Stander were acting within their areas of administrative responsibility in attempting to counsel Jane Taylor on 2/12/14 with respect to agency standards and her performance of duties. This investigation finds that Jane Taylor was insubordinate to Team Leaders Beitter and Stander in her refusal to allow them to get through the counseling memorandum, stating, "No, I won't get through it," or words to that effect and leaving the office.

2. This investigation finds that Jane Taylor was insubordinate to Team Leader Liam Stander by her statement, "I'm going to keep making phone calls while you read," or words to that effect, as he continued to read the counseling memo.

3. This investigation finds that Jane Taylor was insubordinate to Team Leader Kristi Beitter as she read the letter placing her on Administrative Leave, with her statement, "I'm not signing it" or words to that effect.

4. This investigation finds that Ms. Taylor knowingly made several false statements to her attorney by telephone while these events were occurring, including that she was being retaliated against for turning someone in, and that Team Leaders Beitter and Stander were "…putting

me out…" because she refused to sign the memos.  No documentation on record supports these statements in any way.

5.  This investigation finds that Jane Taylor was insubordinate to Team Leaders Kristi Beitter and Liam Stander in her attempt to utilize an agency computer after being advised that she was on Administrative Leave and that she must leave the premises.

6.  Refusal to participate as directed in the scheduled interrogation on 3/12/14 constitutes a further act of insubordination.  Capital District DDSO provided reasonable notification to Ms. Taylor of the interrogation for the purpose of providing her opportunity to answer questions related to her conduct and to represent her position in this matter.  In declining participation, Ms. Taylor forfeited her opportunity to respond to the issues addressed herein.

(Dkt. No. 79-3, pp. 117–18).  Plaintiff admitted that she did not attend the interrogation on

March 12, 2014.  (Dkt. No. 79-2, p. 214; Dkt. No. 79-5, pp. 13–14).   While Plaintiff was out on

administrative leave, she posted on Facebook about her "paid vacation" and a trip to Florida.

(Dkt. No. 88-6, pp. 173–74).  Defendant LaBarge testified that her husband informed her about

the postings.  (*Id.*, pp. 114–16).

On November 6, 2014, the New York State Justice Center For the Protection of People

with Special Needs issued a report finding it substantiated that Plaintiff had failed to report

allegations of a reportable incident of abuse or neglect, which constituted "Category 3 abuse

(obstruction of reports of reportable incidents) pursuant to Social Services Law § 493(4)(c)."

(Dkt. No. 79-3, pp. 132–33).  According to Plaintiff, the Justice Center was also involved in the

OPWDD's retaliation against her.  (Dkt. No. 79-2, p. 202).

On December 2, 2014, Plaintiff was suspended without pay, and the notice stated that

"[t]his action is being taken against you because your continued presence on the job has been

deemed to represent a potential danger to persons or property and/or severely interferes with the

operations of the Office for People with Developmental Disabilities." (Dkt. No. 79-3, pp. 134–35). The suspension notice charged Plaintiff with the following "misconduct/incompetence":

1. On February 4, 2014 at approximately 10:15am, while working at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Liam Stander directed you not to call the police, dial 911, and/or CN's probation officer, you stated "I don't care and I am going to call anyway" or words to that effect and hung up the phone.

2. On February 4, 2014, at approximately 2:00pm, while working at the Fort Edward Hab, you made an inappropriate comment to a co-worker. Specifically, when you called Treatment Team Leader Alex Barlow, Chad Dominie answered the phone and you responded, "Oh, it's wimpy Chad" or words to that effect.

3. On February 4, 2014 at approximately 10:45am, while working at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Alex Barlow called you to give you directives, you told her that "I will not listen to what you have to say" or words to that effect.

4. On February 4, 2014 at approximately 12:15pm, while working at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Alex Barlow called you again to give you directives and told you that your failure to listen to her directives would be insubordination and could lead to disciplinary action, you stated, "Get me for insubordination. I don't care, I'm not listening" or words to that effect.

5. On February 10, 2014 at approximately 2:28pm, while working at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Liam Stander called you and directed you to come to his office to meet with him by 3:15, you responded, "I don't think so. I'm not going anywhere without my lawyer present." Mr. Stander advised you that failure to come would be considered insubordination, that you did not have the right to counsel to speak with your supervisor, and asked if he could expect you by 3:15. You again responded, "I don't think so."

6. On February 12, 2014 at approximately 12:30pm, while working at the Fort Edward Day Hab, you were insubordinate. Specifically, while in the office at the Fort Edward Day Hab with Treatment Team Leaders Liam Stander and Kristi Beitter for a counseling session, you stated "No, I won't get through it" or words to that effect and walked out the door.

7. On February 12, 2014 at approximately 12:30pm, while at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Liam Stander continued with the counseling session, you stated "I'm going to keep making phone calls while you read" or words to that effect.

8. On February 12, 2014 at approximately 12:30pm, while at the Fort Edward Day Hab, you were insubordinate. Specifically, when Treatment Team Leader Beitter placed you on Administrative Leave and directed you to leave State property, you stated "I'm getting on the computer" or words to that effect and refused to leave the Day Hab until the police arrived and escorted you out.

9. On March 12, 2014 at approximately 1:00pm, you were insubordinate. Specifically, you were directed to report to Capital District DDSO OD Heck Campus at 1:00pm for an interrogation and you did not report.

(*Id.*, pp. 136–37). The second charge, relating to an alleged comment about Chad Dominie, was later withdrawn. (Dkt. No. 88-10, pp. 17–18). Heidi-Lynn Wagner testified that Plaintiff was suspended because:

"[S]he showed a pattern of behavior where she was not going to listen to her managers, and it was clear that she was going to do whatever it was that she wanted. So, in our opinion – in my opinion, it was that she showed that she was not going to be able to participate in her regular work habits – or her regular work procedures if she wasn't going to follow directions and be a severe interruption to the operation."

(Dkt. No. 88-10, p. 58).

### K. Arbitration and Termination

Plaintiff appealed her suspension and an arbitration was held over several days in March 2015. (Dkt. Nos. 88-10 through 88-14). On March 11, 2015, the arbitration was settled, such that Plaintiff received 10 weeks of back-pay, that she would be on administrative leave until April 1, 2015, and that on or before April 1, 2015, Plaintiff would retire, submit her resignation or be terminated from employment. (Dkt. No. 79-3, p. 141). OPWDD also agreed to restore Plaintiff's accrued leave during that time period, and Plaintiff released OPWDD from all claims with respect to the settlement, with the exception of those asserted in this action. (*Id.*). Plaintiff's employment was terminated on April 1, 2015. (*Id.*, p. 143).

### L.  Plaintiff's Deposition Testimony

On September 11, 2015, Plaintiff was deposed in this action.  (Dkt. No. 79-2).  Plaintiff was questioned about a Facebook posting that she made on March 1, 2015, which depicted a cartoon image of a person, meant to represent Plaintiff, surfing on a wave of money, with a caption that stated, "Payday! Wish me luck this week . . . "  (*Id.*, pp. 220–27; Dkt. No. 79-8).  Plaintiff denied that the Facebook posting about a "Payday" related to her arbitration hearing (which began on March 3, 2015), and she claimed instead that it was motivated by her receiving an annuity payment.  (Dkt. No. 79-2, pp. 220–24).  Moments later, however, Plaintiff admitted upon further questioning that the Facebook posting did relate to the arbitration hearing and that she had no annuities.  (*Id.*, pp. 225–27).  Plaintiff admitted that she initially lied to "cover up" the true nature of the Facebook posting.  (*Id.*, pp. 226–27).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

### A.  Motion for Sanctions

To begin, Defendants argue that Plaintiff's case should be dismissed as a sanction for lying under oath at her deposition.  (Dkt. No. 79-36, p. 7).  Although Defendants invoke Rule 37 of the Federal Rules of Civil Procedure, that rule does not specifically address the instant situation.  But it is well-established that courts have the inherent power to sanction litigants for conduct which abuses the judicial process.  *See Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246 (1944) ("we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process").  That includes perjured deposition testimony.  *See Rybner v. Cannon Design, Inc.*, No. 95 Civ. 0279, 1996 WL 470668, at *3, 1996 U.S. Dist. LEXIS 12068, at *7-8 (S.D.N.Y. Aug. 20, 1996) (Sotomayor, J.).  The sanction of dismissal, however, is only appropriate in rare, extreme cases. *Id.* (citing *inter alia Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996); *Simmons v. Abruzzo*, 49 F.3d 83, 88 (2d Cir. 1995)).  Before applying this harsh remedy, the Court must consider the severity of the litigant's conduct, its effect on the case, and the suitability of lesser sanctions, among other factors.  *Id.*

First, it is clear that Plaintiff committed perjury by lying under oath at her deposition about the nature of the "Payday" Facebook posting.  *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) ("A witness testifying under oath or affirmation" commits perjury if she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.").  Plaintiff's conduct is disturbing and deserving of sanction, but importantly, it does not amount to a fraud upon the court. *See Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) ("neither perjury nor

17

nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant"); *In re Grievance Comm. of U.S. Dist. Ct., Dist. of Connecticut*, 847 F.2d 57, 64 (2d Cir. 1988) ("Untruthful testimony by a witness, which has not been suborned by his lawyer, does not, standing alone, constitute fraud upon the court.  This is particularly true where, as here, the testimony is given during a pretrial deposition.") (Van Graafeiland, concurring) (citations omitted).

Moreover, Plaintiff's false deposition testimony does not fundamentally undercut her retaliation claims.  In other words, while Plaintiff's deception about the "Payday" Facebook posting casts some doubt on her credibility and motivation, it does not necessarily suggest that her claims lack merit.  And given Plaintiff's hasty admission of the truth, it cannot be said that the initial falsehood corrupted the fact-finding process or caused any prejudice to Defendants.  All of these facts distinguish the instant matter from the more extreme cases cited by Defendants.  *See also Rybner*, 1996 WL 470668, at *6, 1996 U.S. Dist. LEXIS 12068, at *15-16 ("Because the truthfulness of Rybner's resume is not central to the claim against Cannon and because Rybner did not engage in prolonged or repeated obstructionist conduct in perpetuating his lie, Rybner's conduct is not sufficiently egregious to warrant the extraordinary sanction of dismissal of his complaint, especially because other lesser sanctions are adequate to protect the integrity of the judicial system.").

Finally, dismissal is not appropriate in this case because there is a less drastic sanction available.  Should Plaintiff's case survive summary judgment, Defendants will be permitted to inform the jury of Plaintiff's dishonesty and a jury instruction will be given that any falsehood should be considered seriously by jurors in assessing her credibility.[2]  "Given the importance of

---

[2] *See, e.g.*, Modern Federal Jury Instruction 76-8 regarding Prior Perjury.

credibility of witnesses in this case and the fact that plaintiff bears the burden of proof in the action, this is a potent sanction." *Rybner*, 1996 WL 470668, at *6, 1996 U.S. Dist. LEXIS 12068, at *16. *See also Gleason*, 860 F.2d at 560 ("[p]erjury and fabricated evidence . . . can and should be exposed at trial") (quoting *Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters*, 675 F.2d 1349, 1357 (4th Cir. 1982), *cert. denied*, 459 U.S. 1128 (1983)).

Accordingly, Defendants' motion for the sanction of dismissal is denied.

### B. Motion for Summary Judgment

#### 1) First Amendment Retaliation Claim

Plaintiff's first claim, brought under 42 U.S.C. § 1983, alleges that Defendants Turck and LaBarge retaliated against her in violation of the First Amendment to the United States Constitution. Specifically, Plaintiff asserts that after the *New York Times* article quoting her was published in November 2011, "defendants subjected plaintiff to a series of adverse actions, including the NOD in May 2013, the HIPAA investigation in November 2013, the administrative leave that extended from February through December 2014, and the nine disciplinary charges served on plaintiff in December 2014." (Dkt. No. 86, p. 23). Defendants argue that Plaintiff's claim "fails to make out a prima facie case because she was not subject to legally sufficient adverse action until over a year after publication of the *New York Times* news article at issue." (Dkt. No. 79-36, p. 13; *see also* Dkt. No. 89, p. 6).

To survive summary judgment on a First Amendment retaliation claim, "a public employee must establish a *prima facie* case by bringing forth evidence showing that (1) [s]he has engaged in protected First Amendment activity, (2) [s]he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting

*Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007) (internal quotation and alterations omitted)).

First, there is no dispute that Plaintiff engaged in protected speech by communicating with *The New York Times* in November 2011. *See also* Dkt. No. 26, p. 14 ("To the extent that plaintiff's First Amendment retaliation claims are based on statements she made to reporters at the New York Times, the Court finds that they are potentially protected speech claims under the First Amendment."). However, Defendants argue that Plaintiff has failed to show evidence of a causal connection between this protected speech and any of the alleged adverse employment actions she later suffered. (Dkt. No. 79-36, pp. 16–19; Dkt. No. 89, pp. 6–11).

### a. Personal Involvement

As a threshold matter, personal involvement of an individual defendant "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). "Because vicarious liability is inapplicable to . . . § 1983 suits," Plaintiff must raise a genuine dispute as to whether "each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added). "Personal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Id.* at 67 (quoting *Provost*, 262 F.3d at 155); *see also Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) ("a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority").

Thus, in order to succeed on her First Amendment retaliation claim against Defendants Turck and LaBarge, Plaintiff must show that they were personally involved in the underlying adverse employment actions. And yet Plaintiff points to no such evidence. Rather, the record shows the following: 1) the May 9, 2013 NOD was issued by Heidi-Lynn Wagner; 2) the HIPAA investigation in November 2013 was initiated by Cris Christodulu and led to a counseling memo from Liam Stander; 3) the decision to place Plaintiff on administrative leave involved Margaret O'Brien and Cheryl Greiner; and 4) the decision to suspend Plaintiff involved Ms. Wagner. (*See* Dkt. No. 79-3, pp. 83–85, 105–06; Dkt. No. 88-6, p. 170; Dkt. No. 88-4, p. 126; Dkt. No. 88-11, p. 35; Dkt. No. 88-10, p. 58). As of January 2012, Defendant Turck was no longer Plaintiff's supervisor. (Dkt. No. 79-35, ¶ 4). Defendants LaBarge and Turck state that they had no involvement in any of the above events. (Dkt. Nos. 79-10, 79-12). Against this evidence, Plaintiff offers only pure speculation. For example, when asked about the May 9, 2013 NOD, Plaintiff testified that "Cathy LaBarge could've had something to do with it too since she's got my personnel file," and as to Defendant Turck, "she could've [been involved]. There's always a possibility." (Dkt. No. 79-2, pp. 139–40). However, Plaintiff cannot raise an issue of fact on the basis of these unsupported assertions.

Accordingly, Plaintiff has failed to adduce evidence that Defendants Turck and LaBarge participated in First Amendment retaliation against her, which is grounds for summary judgment on her claim.[3] *See Canner v. City of Long Beach*, No. 12 Civ. 2611, 2015 WL

---

[3] Plaintiff has also failed to adduce evidence showing the personal involvement of these Defendants under any of the other methods recognized by the Second Circuit. *See Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (explaining that a plaintiff may establish personal involvement by making any one of five showings, citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016). The Second Circuit has not expressly addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing personal involvement, *see Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013), but nevertheless, in this case, Plaintiff

4926014, at *4, 2015 U.S. Dist. LEXIS 108980, at *9 (E.D.N.Y. Aug. 18, 2015) ("While the emails demonstrate negative feelings towards Radin and McCormack, plaintiffs still fail to allege that the City Council defendants and Schnirman were at all involved in the actual adverse actions about which plaintiffs complain."); *Stancuna v. Town of Wallingford*, 487 F. Supp. 2d 15, 22 (D. Conn. 2007) ("Here, there is simply no evidence in the record that Dickinson initiated, made, or otherwise caused the Planning and Zoning Department to engage in zoning enforcement activity against plaintiff in February 2005 as plaintiff claims. . . . Plaintiff's speculation that the Mayor somehow had a hand in the enforcement actions taken does not demonstrate a triable claim and does not suffice to defeat summary judgment in favor of Dickinson.").

### b. Causal Connection

Moreover, even assuming there was evidence of Defendants' personal involvement in the alleged adverse employment actions against Plaintiff, she has failed to show a causal connection linking them to her protected speech. "To demonstrate a causal connection 'a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action.'" *Smith*, 776 F.3d at 118 (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). "Since a direct showing requires plaintiff to provide 'tangible proof' of retaliatory animus, 'conclusory assertions of retaliatory motive' are insufficient." *Id.* (quoting *Cobb*, 363 F. 3d at 108).

---

has failed to show the personal involvement of Defendants Turck and LaBarge even under the *Colon* standards.

### i. Temporal Proximity

Defendants argue that the adverse employment actions alleged by Plaintiff all "occurred either *before* the November 11, 2011 publication date of *The New York Times* article, or so *long after* it that it cannot be considered causally connected." (Dkt. No. 79-36, p. 17). In response, Plaintiff has identified several events post-dating the article, specifically the May 9, 2013 NOD, the "HIPAA investigation" in November 2013, her placement on administrative leave from February 12, 2014 to December 2, 2014, and her suspension on December 2, 2014 due to various disciplinary charges. (Dkt. No. 86, p. 23).

The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). But "courts in this circuit have typically measured that gap as a matter of months, not years." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012).

Here, assuming each event identified by Plaintiff constitutes an adverse employment action, they are too far removed from the publication of *The New York Times* article to infer a causal connection.[4] Almost a year and a half passed between Plaintiff's protected speech and the earliest adverse employment action, the May 9, 2013 NOD. (Dkt. No. 79-3, pp. 83–85). Approximately two years passed before the HIPAA investigation, and administrative leave and suspension came even later. (*Id.*, pp. 115–16, 136–37). Therefore, Plaintiff cannot rely on evidence of temporal proximity to establish causation. *See also Clark County Sch. Dist. v.*

---

[4] To the extent Plaintiff alleges that she was excessively scrutinized at work by Defendant Turck in retaliation for her protected speech (*see* Dkt. No. 79-2, pp. 46–48), such conduct does not amount to an adverse employment action. *See Ortiz v. Metro. Transp. Auth.*, 615 F. App'x 702, 702–04 (2d Cir. 2015) (finding that "excessive scrutiny" and "micromanagement" of the plaintiff by her supervisors did not qualify as adverse employment actions).

*Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1820 (2017) ("This gap of some sixteen months is too long to support a retaliation claim based solely on temporal connection."); *Frisenda v. Inc. Village of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) ("courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation") (collecting cases).

### ii. Evidence of Retaliatory Animus

Plaintiff attempts to show evidence of retaliatory animus by pointing to several comments Defendant LaBarge made about her. (Dkt. No. 86, p. 24). In an email thread relating to Plaintiff's allegation that a co-worker had inappropriate contact with an OPWDD client on November 6, 2012, Defendant LaBarge wrote: "This is Ms. Taylor's usual 'MO' . . . when she gets angry she files false allegations, which is actually what two prior NOD's referenced. (the second one was, unfortunately, removed from her PH file after a certain period of time. Whomever settled that NOD, I'd like to smack them.)." (Dkt. No. 88-6, p. 143). She also referred to Plaintiff as an "obnoxious bitch" and wrote that "Unfortunately, Central Office does not see this as a termination or demotion case." (*Id.*, pp. 142, 154). When Defendant LaBarge received an email about the subsequent May 9, 2013 NOD, she responded "Come here and let me kiss you!!" and offered to provide Plaintiff's disciplinary history. (*Id.*, p. 165). However, none of these comments have any discernable relation to *The New York Times* article. At most, they show that Defendant LaBarge had a *personal* animus toward Plaintiff, not a retaliatory one.

As to Defendant Turck, Plaintiff has not identified any direct evidence of retaliatory animus whatsoever.[5]

Plaintiff also suggests that causation can be inferred based on evidence "that defendants had a longstanding practice of retaliation against plaintiff, predating the *New York Times* article." (Dkt. No. 86, p. 25). Presumably, Plaintiff is referring to her allegation that Defendants previously retaliated against her for raising concerns with the OPWDD Ombudsperson in July of 2010. (*See* Dkt. No. 79-2, p. 62). The record shows that Plaintiff received several counseling memos and NODs thereafter in 2010 and 2011. (Dkt. No. 79-3, pp. 8, 32, 34). However, Plaintiff had also received a counseling memo in 2004, and she was counseled in June of 2010. (Dkt. No. 79-3, pp. 5–6; Dkt. No. 79-35, ¶ 35). The recurring theme in these episodes, before and after Plaintiff voiced complaints, was the charge that Plaintiff made false allegations against co-workers and was insubordinate to supervisors. (*See, e.g.*, Dkt. No. 79-3, pp. 8, 32, 83–85, 107–08). Thus, the record evidence does not support an inference that Defendants "held a longstanding grudge against plaintiff because of her outspoken objections to abuses in the workplace." (Dkt. No. 86, p. 25). It is also worth noting that Plaintiff's theory is entirely absent from her complaint to the New York State Division of Human Rights on September 6, 2011, which alleged that Defendant Turck harassed her because of Plaintiff's disability, that Defendant Turck issued Plaintiff counseling memos and a NOD "because I am a heterosexual and my other coworkers, who have engaged in improper conduct, are homosexual," and that Defendant Turck was "romantically" interested in Plaintiff and retaliated against her "*due to sexual orientation*." (Dkt. No. 79-3, pp. 35–39) (emphasis added).

---

[5] At most, the record shows that Defendant Turck disliked Plaintiff for filing an unsubstantiated sexual harassment complaint against her with the State Division of Human Rights, (Dkt. No. 88-6, p. 137), not because Plaintiff later spoke to *The New York Times*.

In sum, Plaintiff has failed to adduce any evidence that her protected speech to *The New York Times* in 2011 was a substantial motivating factor in the adverse employment actions she suffered in 2013 and 2014. Simply put, viewing all of the facts in the light most favorable to Plaintiff, no reasonable jury could find a causal connection. Plaintiff's "conclusory assertions of retaliatory motive" are insufficient to survive judgment. *See Smith*, 776 F.3d at 118; *see also Young v. Westchester Cty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003) ("[W]here the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation."). Accordingly, Plaintiff's First Amendment retaliation claim must be dismissed.

### 2) Rehabilitation Act Claim

Plaintiff's second claim alleges that Defendant OPWDD retaliated against her in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* Section 504 of the Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a). The Rehabilitation Act also "protects individuals who oppose any practice that the Rehabilitation Act makes illegal." *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. Jan. 11, 2016) (citing 29 C.F.R. § 1614.101(b)).

Claims for retaliation under the Rehabilitation Act are analyzed under the same burden-shifting framework established for Title VII cases. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To establish a *prima facie* case of retaliation, Plaintiff must show that: 1)

she engaged in protected activity; 2) the Defendant was aware of this activity; 3) the Defendant took adverse action against her; and 4) a causal connection exists between the protected activity and the adverse action.  *Id.* at 720.[6]  "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  If a defendant meets this burden 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'"  *Id.* at 721 (quoting *Cifra v. GE*, 252 F.3d 205, 216 (2d Cir. 2001)).

Defendants argue Plaintiff has failed to show that she engaged in activity protected by the Rehabilitation Act, or that a causal connection exists between any protected activity and an adverse action.  (Dkt. No. 79-36, pp. 19–25).

### a.  Protected Activity

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  The Rehabilitation Act specifically prohibits exclusion, denial of benefits, and discrimination against a disabled person with respect to a public entity's services or programs, "solely by reason of her or his disability." 29 U.S.C. § 794(a).  "Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation."  *B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016).

---

[6] It is unsettled in this Circuit whether a plaintiff must show that the retaliation was a "but for" cause or merely a motivating factor.  *See Eisner v. Cardozo*, 684 F. App'x 29, 30 (2d Cir. 2017); *Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 403 n.12 (E.D.N.Y. 2016).  As set forth below, the Court does not need to decide the standard in this case.

As evidence of protected activity, Plaintiff asserts that she "regularly advocated on behalf of AB," an OPWDD client, pointing to the reports she made to the Ombudsperson in July 2010.  (Dkt. No. 86, p. 26).  The record shows that Plaintiff raised concerns that a co-worker yelled at A.B. for having ice cream in front of other OPWDD clients, that another co-worker joked that A.B. was joining the circus in an internal OPWDD email, and that A.B. was not allowed to go the movies on one occasion.  (Dkt. No. 79-35, ¶¶ 56, 60, 63; Dkt. No. 79-2, pp. 103–06; Dkt. No. 88-9, pp. 77–80).  However, Plaintiff does not explain how her complaints pertained to discrimination against A.B. "solely by reason of" her disability.  There is no evidence that A.B. was yelled at or denied an outing to the movies *because of her disability*, or that she received the objectionable email.  In other words, Plaintiff has not shown that her complaints to the Ombudsperson related to A.B. being treated differently than a non-disabled person.  Therefore, Plaintiff has failed to show that she engaged in protected activity under the Rehabilitation Act.[7]  *See Maioriello v. New York State Office for Developmental Disabilities*, No. 14 Civ. 214, 2015 WL 5749879, at *14–15, 2015 U.S. Dist. LEXIS 131967, at *37–38 (N.D.N.Y. Sept. 30, 2015) (noting that the mistreatment of persons with disabilities, while unfortunate, does not necessarily reflect discrimination by reason of their disability) (citing *Beaver v. Melotte*, No. 08 Civ. 187, 2008 WL 4610317, at *1, 2008 U.S. Dist. LEXIS 110966, at *3–4 (E.D. Wis. Oct. 15, 2008)).

### b.  Adverse Action and Causal Connection

Further, even if Plaintiff did engage in protected activity by raising concerns with the Ombudsperson in July 2010, she has failed to show a causal connection to an adverse action.

---

[7] To the extent that Plaintiff alleges that she also reported an incident where a co-worker "ripped the headphones" off A.B., (Dkt. No. 79-2, p. 233), Plaintiff has failed to adduce any evidence to infer that her report amounted to a protest against disability discrimination.  The same is true for Plaintiff's report that three OPWDD clients were left in a van for too long on a hot day.  (Dkt. No. 79-35, ¶ 58).

Plaintiff argues that "[t]he jury may find that defendants issued the formal counseling memo to Taylor in May 2011 solely to intimidate, discredit and silence AB's sole disability advocate." (Dkt. No. 86, p. 27). Defendants contend that the receipt of a counseling memo or NOD does not constitute an adverse action, unless it also impacts wages. (Dkt. No. 79-36, pp. 20–21). But in retaliation cases, the standard for an adverse employment action is "not as demanding as it is in a discrimination claim." *Quadir v. N.Y. State D.O.L.*, 39 F. Supp. 3d 528, 542 (S.D.N.Y. 2014). Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 542–43 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Notably, the May 24, 2011 formal counseling memo did not come with any associated disciplinary sanction, and the purpose of the counseling was to review reporting procedures. (Dkt. No. 79-3, p. 34). Therefore, based on the evidence in this case, the counseling memo falls short of an adverse action because it would not have deterred a reasonable employee from engaging in protected activity.[8] *See Quadir v. N.Y. State D.O.L.*, No. 13 Civ. 3327, 2016 WL 3633406, at *7, 2016 U.S. Dist. LEXIS 84632, at *20 (S.D.N.Y. June 29, 2016) ("The complained-of counseling memos . . . are concededly not disciplinary in nature and would not have deterred a reasonable employee from engaging in protected activity."), *aff'd*, 691 F. App'x 674 (2d Cir. 2017); *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[W]e have held, in the context of the issuance of a 'counseling memo,' that 'criticism of an employee (which is part of training and necessary to allow employees to

---

[8] It is also worth noting that Plaintiff was not deterred from raising the same concerns six months later with *The New York Times*. *See Tepperwien*, 663 F.3d at 572.

develop, improve and avoid discipline) is not an adverse employment action.'") (citation omitted).

Plaintiff also suggests that her advocacy on behalf of A.B. resulted in her suspension without pay in December 2014. (Dkt. No. 86, p. 26). But this adverse action came more than *four years* after Plaintiff raised concerns with the Ombudsperson in July 2010. (Dkt. No. 79-3, pp. 134–35). As discussed above, this sort of gap in time does not permit an inference of causation, and Plaintiff has not pointed to any other evidence to establish a link. In sum, viewing all of the facts in the light most favorable to Plaintiff, no reasonable jury could find a causal connection between Plaintiff's protected activity, if any, and an adverse action. Accordingly, Plaintiff's Rehabilitation Act claim must be dismissed.[9]

### 3) New York State Law Claim

Finally, since none of Plaintiff's federal claims survive summary judgment, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim for violation of New York State Human Rights Law.[10] *See* 28 U.S.C. § 1367(c)(3); *Snow v. Village of Chatham*, 84 F. Supp. 2d 322, 329 (N.D.N.Y. 2000).

## V.    CONCLUSION

For these reasons, it is

---

[9] Furthermore, Defendants have articulated a legitimate, non-retaliatory reason for Plaintiff's December 2014 suspension, namely Plaintiff's insubordination. (Dkt. No. 79-36, pp. 24-25). Plaintiff has admitted to some of the underlying conduct, (Dkt. No. 79-2, pp. 164–71, 211–14; Dkt. No. 79-5, pp. 8–9, 13–14), which is similar to past allegations of insubordination. (*See* Dkt. No. 79-3, pp. 8, 107–08). Although Plaintiff disagrees with Defendants' characterization of certain events and offers explanations for her actions, (Dkt. No. 86, pp. 16–20), she has not pointed to any evidence that Defendants' cited reason for suspending her was *a pretext for impermissible retaliation*.

[10] Plaintiff's NYSHRL claim may also be deemed abandoned since Plaintiff has failed to respond to Defendants' substantive arguments in favor of summary judgment. *See Haining Zhang v. Schlatter*, 557 F. App'x 9, 13 (2d Cir. 2014) (deeming claims abandoned where the "plaintiffs have failed meaningfully to challenge the dismissal of their claims"); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (dismissing claims as abandoned where the plaintiff "did not raise any arguments opposing Defendants' motion regarding these . . . claims") (citing cases).

**ORDERED** that Defendants' motion for sanctions or alternatively summary judgment (Dkt. No. 79) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendants' request for sanctions is **DENIED**; and it is further

**ORDERED** that summary judgment is **GRANTED**; and it is further

**ORDERED** that The Third Amended Complaint (Dkt. No. 58) is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Date:   November 9, 2017
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

31